IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN-DUBUQUE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MEDICAL WEB SERVICES,<br>STEPHEN L. ANCIER, M.D.,<br>DAVID M. BARON, M.D.,<br>FELIX RODRIGUEZ-SCHMIDT, M.D.,<br>ALEXIS ROMAN-TORRES, M.D.,<br>KIMBERLY TREVER, M.D.,<br>IRIC SPEARS,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. CR 08-1318<br><br>**DRUG CONSPIRACY**<br>**Count 1:** 21 U.S.C. §§ 841(a)(1),<br>841(b)(1)(D), 841(b)(1)(D)(2), and 846<br><br>**DISTRIBUTION OF SCHEDULE III**<br>**CONTROLLED SUBSTANCES**<br>**Counts 2, 7, 13-14, 17:**<br>21 U.S.C. §§ 841(a)(1), 841(b)(1)(D)<br><br>**DISTRIBUTION OF SCHEDULE IV**<br>**CONTROLLED SUBSTANCES**<br>**Counts 3-6, 8-12, 15-16, 18-22:**<br>21 U.S.C. §§ 841(a)(1), 841(b)(1)(D)(2)<br><br>**FORFEITURE** |

## INDICTMENT

The Grand Jury charges:

## INTRODUCTION

At all times relevant to this indictment:

### Regulations and Requirements Regarding
### the Distribution of Controlled Substances by Prescription

1.     The Controlled Substances Act, codified in Title 21, United States Code,

Section 801 et seq., defines certain drugs, other substances, and their immediate

precursors, as "controlled substances." 21 U.S.C. § 802(6).  These controlled

substances are listed within one of five established Schedules, Schedules I-V.

21 U.S.C. § 802(6).

PRESENTED IN OPEN COURT
BY THE
FOREMAN OF THE GRAND JURY
IN THE PRESENCE OF THE
GRAND JURY

And filed  08/06/08

ROBERT L. PHELPS, CLERK

2.      Placement of a controlled substance within a Schedule depends on the drug's potential for abuse and accepted medical use.  21 U.S.C. § 812(b).  Within this continuum, Schedule I controlled substances are those drugs, substances, and immediate precursors with a high potential for abuse and no accepted medical use in the United States, such as heroin.  21 U.S.C. § 812(b)(1).  Conversely, Schedule V controlled substances are those drugs, substances, and immediate precursors with a low potential for abuse and an accepted medical purpose, such as codeine cough syrup.  21 U.S.C. § 812(b)(5).

3.      Falling in the middle of this continuum are Schedule III and IV controlled substances.  Schedule III controlled substances are those drugs, substances, and immediate precursors which have less potential for abuse than those listed in Schedule I and II and have a currently accepted medical use, but abuse of which may lead to moderate or low physical dependence or high psychological dependence.  21 U.S.C. § 812(b)(3).  Schedule IV controlled substances are those drugs, substances, and immediate precursors with less abuse potential, relative to those in Schedule III, with accepted medical uses, but which, if abused, may lead to limited physical dependence or psychological dependence.  21 U.S.C. § 812(b)(4).

4.      Some non-controlled drugs, substances, and immediate precursors are also subject to federal regulation.  These are classified as "prescription drugs" due to their toxicity, or because they have potentially harmful effects if not used under the supervision of a licensed practitioner.  21 U.S.C. § 353(b).

2

5.     Controlled substances and non-controlled prescription drugs may be distributed and dispensed lawfully by means of a "prescription," if that prescription is issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice. 21 C.F.R. § 1306.04 (a). A "prescription" is defined as an order for medication which is dispensed to, or for, an ultimate user. 21 C.F.R. § 1300.01(b)(35). Prescriptions must be dated as of, and signed on, the day "when issued," and must bear "the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). A practitioner may sign a prescription "in the same manner as he would sign a check or legal document." 21 C.F.R. § 1306.05(a). Thus, unless an oral order is permitted, "prescriptions shall be written with ink or indelible pencil or typewriter and shall be manually signed by the practitioner." 21 C.F.R. § 1306.05(a). The prescriptions may be prepared by the "secretary" or "agent" "for the signature of the practitioner," but the prescribing practitioner is responsible for ensuring the prescription conforms in all essential respects to the law and regulations. 21 C.F.R. § 1306.05(a). No statutory definition of "legitimate medical purpose" and "usual course of professional practice" exists.

6.     The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. 21 C.F.R. §§ 1306.04 (a), 1306.05(a). For a prescription for a controlled substance to be effective, it "must be issued for a

3

legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). "An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent" of the Controlled Substances Act. 21 C.F.R. § 1306.04(a). Thus, "[t]he person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law related to controlled substances." 21 C.F.R. § 1306.04(a).

7.      Every physician who distributes or dispenses controlled substances must obtain a Drug Enforcement Administration Registration Number ("DEA Registration"), which is issued by the Attorney General. 21 U.S.C. § 822(a). This DEA Registration must be renewed every one to three years. 21 U.S.C. § 822(a). Prerequisites to obtain a DEA Registration include: (1) a valid medical degree; and (2) a valid state medical license and state controlled substance license, where applicable. 21 U.S.C. § 822(a).

8.      Every pharmacy that distributes or dispenses any controlled substance must also obtain a DEA Registration. 21 U.S.C. § 822(a). This DEA Registration must also be renewed every one to three years. 21 U.S.C. § 822(a). Prerequisites for a pharmacy to obtain a DEA Registration include a valid state pharmacy license and a state controlled substance license, where applicable. 21 U.S.C. § 822(a). A separate registration is required "at each principal place of business or professional practice where the [pharmacy] . . . dispenses controlled substances." 21 U.S.C. § 822(a).

9.     A pharmacist may dispense Schedule III and Schedule IV controlled substances only: (1) pursuant to a written prescription signed by a practitioner; (2) a facsimile of a written signed prescription transmitted by the practitioner or the practitioner's agent to the pharmacy; or (3) pursuant to an oral prescription made by an individual practitioner and promptly reduced to writing by the pharmacist.  21 C.F.R. § 1306.21(a).

## DRUG CONSPIRACY

## COUNT 1

10.     The Grand Jury realleges and incorporates paragraphs 1 through 9 of the Indictment as if fully set forth herein.

### Objects of the Conspiracy

11.     Between about June 2002, and continuing until at least May 20, 2004, in the Northern District of Iowa and elsewhere, the defendants MEDICAL WEB SERVICES; STEVEN L. ANCIER, M.D.; DAVID M. BARON, M.D.; FELIX RODRIGUEZ-SCHMIDT, M.D.; ALEXIS ROMAN-TORRES, M.D.; KIMBERLY TREVER, M.D.; and IRIC SPEARS did knowingly and intentionally conspire, confederate and agree, with each other, and with other persons known and unknown to the Grand Jury, to commit the following offenses:

1)     To dispense and cause to be dispensed Schedule III controlled substances outside of the usual course of professional practice and without legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D); and

2)     To dispense and cause to be dispensed Schedule IV controlled substances outside of the usual course of professional practice and

5

without legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

This in violation of Title 21, United States Code, Section 846.

## Manner and Means

### Medical Web Services' Internet Business and Websites

12.    Medical Web Services was a corporation doing business in Sunrise, Florida, and elsewhere. Medical Web Services was in the business of using the Internet to sell prescription drugs, that is pharmaceutical controlled and non-controlled substances for which a valid prescription is required for distribution. Medical Web Services conducted these prescription drug sales through a large number of affiliated Internet websites. These websites were hosted by, or linked to, Medical Web Services through affiliates. These affiliate websites included, among others: (1) www.pill-pharmacy.com; (2) www.reorderrx.com; (3) www.reorder-rx.com;

(4) www.valueprescribe.com; (5) www.1valueprescribe.com; (6) www.purchase-ultram.com; (7) www.purchase-didrex.com; (8) www.adipex-xenical-phentermine.com;

(9) www.ezpharmacyonline.com; (10) www.diet-adipex.com;

(11) www.overnightprescriptions.com; (12) www.drugs2youonline.com;

(13) www.PharmacyOnline.com; (14) www.PrescriptionsOnline.com;

(15) www.viagraovernite.com; (16) www.e-rx-com; (17) www.rxdieting.com;

(18) www.webmedrx.com; (19) www.webmedsrx.com; (20) www.ewebscripts.com;

(21) www.e-fatloss.com; (22) www.virtualdrugshop.com; (23) www.cyber-med.com;

(24) www.prescriptiondieting.com; (25) www.rxpricebuster.com; (26) www.cheap-

phentermine.com; (27) www.getmyrxnow.com; (28) www.lower-price-drugs.com;

(29) www.go-scripts.com; (30) www.doctorsrx.com; (31) www.mymdscripts.com;

(32) www.econfidentialrx.com; (33) www.easy-scripts.com; (34) www.clickhererx.com;

(35) www.rapid-rx.com; (36) www.drs-rx.com; (37) www.doc-rx.net; (38) www.rx-

valueprescribe.com; (39) www.onedayrx.com; (40) www.one-day-rx.com;

(41) www.quicknetrx.com; (42) www.rxonlinepharmacy.com;

(43) www.pharmacyontime.com; (44) www.Scriptsontime.com;

(45) www.drugrxstore.com;  (46) www.readyrx.com; (47) www.medzonsale.com;

(48) www.247meds.com; (49) www.123ezdrugs.com;

(50) www.buyphentermineonlinetoday.com; (51) www.edietpharmacy.com;

(52) www.mainpharmacy.com; (53) www.mypharmacystore.com;

(54) www.pharmacydrugcenter.com; (55) www.pharmacydirectonline.com;

(56) www.drugsnextday.com; (57) www.prescriptionsgo.com; (58) www.bestwebrx.com;

(59) www.drugs4you.com; (60) www.dr-script.com; (61) www.direct2yourx.com;

(62) www.reliablerxonline.com; (63) www.onlinerxnow.com;

(64) www.drapprovedrx.com; (65) www.reliablerx.net; (66) www.canadameds2you.com;

(67) www.1rxonline.com; (68) www.rxordernow.com; (69) www.yourrxnow.com;

(70) www.rxdrugmd.com; (71) www.bestprice-drugs.com; and (72) www.buy-

phentermine-prescription-diet-pills-online-pharmacy.com.

     13.     Internet customers logged onto one of the domain names owned,

operated, hosted, or linked to Medical Web Services and placed orders for prescription

drugs.  The customers completed a short health history questionnaire and provided

credit card payment information.  The customers' identities were not verified, nor were customers required to submit any medical records, as part of the ordering process. Doctors contracting with Medical Web Services then reviewed the prescription drug orders.  The doctors approved the prescription drug orders without examining any of the customers, and in the vast majority of cases, without reviewing any medical records. The only contact the doctors had with the customers, if any contact occurred at all, was the occasional brief telephone call or an exchange of e-mails.  If the contracting doctor agreed to approve a drug order, the doctor's electronic signature was digitally affixed by Medical Web Services to a "prescription" created by Medical Web Services' computers. The "prescriptions" were then batched and downloaded from Medical Web Services' website by pharmacies contracted to do business with Medical Web Services.  These contracting pharmacies filled and shipped the controlled substance "prescriptions" to customers throughout the United States.  The contracting pharmacies filled the "prescriptions" without contacting the customers or the doctors who had approved, or purportedly approved, the "prescriptions."  In the vast majority of cases, neither the contracting doctor, nor the contracting pharmacy, were located in the same state as the customer.

14.     During the conspiracy period, more than 175,700 "prescriptions" for controlled substances were authorized and filled by doctors and pharmacists employed by Medical Web Services.  These "prescriptions" resulted in the dispensing of more than 3.7 million Schedule III dosage units and more than 8.8 million Schedule IV dosage units.

A)    More than half of the controlled substance orders processed by Medical Web Services were for diet medications, such as Phendimetrazine, Phentermine, Benzphetamine, and Diethylpropion. Phendimetrazine and Benzphetamine are Schedule III appetite suppressants sold for weight loss. Phentermine and Diethylpropion are Schedule IV appetite suppressants sold for weight loss. Phendimetrazine is marketed under, among other names, Adipost, Anorex-SR, Appecon, Bontril PDM, Bontril Slow-Release, Melfiat, Obezine, Phendiet, Plegine, Prelu-2, and Statobex. Benzphetamine is marketed under, among other names, Didrex. Phentermine is marketed under, among other names, Adipex, Ionamin, and Fastin. Diethylpropion is marketed under, among other names, Tenuate.

B)    The majority of the remaining controlled substance orders processed by Medical Web Services were Benzodiazepines and Zolpidem. Benzodiazepines are a Schedule IV controlled substance used for short-term relief of mild to moderate anxiety and nervous tension. Benzodiazepines include Alprazolam and Diazepam, which are marketed under the brand names of Xanax (Alprazolam) and Valium (Diazepam). Zolpidem is a Schedule IV controlled substance used for short-term treatment of insomnia. Zolpidem is marketed under the brand name of Ambien.

Customers of Medical Web Services paid more than $41 million for "prescriptions" purchased through Medical Web Services during the conspiracy period.

### Medical Doctors

15.    Among the doctors Medical Web Services employed, either directly or though recruiters, to review prescription drug orders were STEPHEN L. ANCIER, DAVID M. BARON, FELIX RODRIGUEZ-SCHMIDT, ALEXIS ROMAN-TORRES, and KIMBERLY TREVER.

16.    STEPHEN L. ANCIER was employed by Medical Web Services from approximately June 17, 2003 to approximately November 17, 2003. During this time period, ANCIER was a medical doctor with a valid DEA Registration in Pennsylvania. ANCIER resided in New Jersey, but was licensed to practice medicine only by the State

of Pennsylvania and the State of Washington.  Drug orders placed by Medical Web

Services' customers, and approved by ANCIER, resulted in the distribution of controlled

substances to customers who then resided in the Northern District of Iowa.

17.     DAVID M. BARON was employed by Medical Web Services from

approximately June 28, 2003 to approximately December 5, 2003.  During this time

period, BARON was a medical doctor with a valid DEA Registration residing in Colorado

and licensed to practice medicine only by the State of Colorado.  Drug orders placed by

Medical Web Services' customers, and approved by BARON, resulted in the distribution

of controlled substances to customers who then resided in the Northern District of Iowa.

18.     FELIX RODRIGUEZ-SCHMIDT was employed by Medical Web Services

from approximately September 24, 2003 to approximately December 7, 2003.  During

this time period, RODRIGUEZ-SCHMIDT was a medical doctor with a valid DEA

Registration residing in Puerto Rico and licensed to practice medicine only by Puerto

Rico.  Drug orders placed by Medical Web Services' customers, and approved by

RODRIGUEZ-SCHMIDT, resulted in the distribution of controlled substances to

customers who then resided in the Northern District of Iowa.

19.     ALEXIS ROMAN-TORRES was employed by Medical Web Services from

approximately November 21, 2003 to approximately May 14, 2004.  During this time

period, ROMAN-TORRES was a medical doctor with a valid DEA Registration residing

in Puerto Rico and licensed to practice medicine only by Puerto Rico.  Drug orders

placed by Medical Web Services' customers, and approved by ROMAN-TORRES,

resulted in the distribution of controlled substances to customers who then resided in

the Northern District of Iowa.

10

20.    KIMBERLY TREVER was employed by Medical Web Services from approximately September 29, 2003 to approximately May 20, 2004.  During this time period, TREVER was a medical doctor with a valid DEA Registration residing in Michigan and licensed to practice medicine only by the State of Michigan.  Controlled substance orders placed by Medical Web Services' customers, and approved by TREVER, were distributed to one or more customers who then resided in the Northern District of Iowa.

**Recruiters**

21.    Medical Web Services established contracts with individuals who recruited physicians to review prescription requests by Medical Web Services customers.  These recruiters were paid a percentage, or per order fee, based upon the recruited physicians' review of drug orders placed through Medical Web Services' websites.  One such recruiter was IRIC SPEARS.  SPEARS owned and operated a business, Malvenia International, which was paid by Medical Web Services for the purported review of controlled substance drug orders by M.R., a doctor SPEARS represented he had recruited to work on Medical Web Services' behalf.  M.R. was a medical doctor with a valid DEA Registration residing in Georgia and licensed to practice medicine in Georgia.  Between about October 30, 2003, and about December 7, 2003, SPEARS approved approximately 2,604 controlled substance drug orders by Medical Web Services' customers in M.R.'s name, using M.R.'s DEA Registration Number, and a scanned signature from M.R.  SPEARS was not a licensed medical doctor, nor did SPEARS have any medical training.  Controlled substance orders placed by Medical Web

11

Services' customers, and approved by SPEARS using M.R.'s identity, were distributed to one or more customers who then resided in the Northern District of Iowa.

### Pharmacies

22.    Medical Web Services established contracts with numerous pharmacies to fill "prescriptions" that were ordered by online customers through the company's website. The pharmacies downloaded and filled batches of electronic "prescriptions" created by Medical Web Services which had purportedly been approved by doctors paid by or through Medical Web Services. One such pharmacy was located in Dubuque, Iowa ("the Dubuque pharmacy"). The Dubuque pharmacy filled "prescriptions" for Medical Web Services from March 2003 through at least September 2, 2003. During this time period, the Dubuque pharmacy filled more than 11,000 "prescriptions" and distributed at least 205,830 dosage units of Schedule III controlled substances and at least 579,270 dosage units of Schedule IV controlled substances on behalf of Medical Web Services. The vast majority of these "prescriptions" were shipped to customers outside the State of Iowa. During this time period, the Dubuque pharmacy was only registered as a pharmacy in Iowa.

## DISTRIBUTIONS OF CONTROLLED SUBSTANCES

23.    As to each of Counts 2-22 below, the Grand Jury realleges and incorporates paragraphs 1 through 22 of the Indictment as if fully set forth herein.

### COUNT 2

24.    On or about August 13, 2003, in the Northern District of Iowa and elsewhere, defendant DAVID M. BARON, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to J.S., a

resident of the Northern District of Iowa, ninety (90) tablets of Phendimetrazine, a Schedule III controlled substance, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D).

## COUNT 3

25.     On or about August 21, 2003, in the Northern District of Iowa and elsewhere, defendant STEPHEN L. ANCIER, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed by the Dubuque pharmacy ninety (90) tablets of Phentermine 37.5 mg, a Schedule IV controlled substance, to B.W., a resident of Missouri, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 4

26.     On or about August 21, 2003, in the Northern District of Iowa and elsewhere, defendant STEPHEN L. ANCIER, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed by the Dubuque pharmacy ninety (90) tablets of Adipex 37.5 mg, a Schedule IV controlled substance, to A.D., a resident of Michigan, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

13

## COUNT 5

27.    On or about August 21, 2003, in the Northern District of Iowa and elsewhere, defendant STEPHEN L. ANCIER, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed by the Dubuque pharmacy ninety (90) tablets of Phentermine 37.5 mg, a Schedule IV controlled substance, to K.K., a resident of Missouri, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 6

28.    On or about August 21, 2003, in the Northern District of Iowa and elsewhere, defendant STEPHEN L. ANCIER, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed by the Dubuque pharmacy ninety (90) tablets of Phentermine 37.5 mg, a Schedule IV controlled substance, to A.A., a resident of Missouri, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 7

29.    On or about August 25, 2003, in the Northern District of Iowa and elsewhere, defendant DAVID M. BARON, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to J.M., a resident of the Northern District of Iowa, ninety (90) tablets of Didrex 50 mg, a Schedule

III controlled substance, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D).

## COUNT 8

30.     On or about August 28, 2003, in the Northern District of Iowa and elsewhere, defendant DAVID M. BARON, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to P.S., a resident of the Northern District of Iowa, ninety (90) tablets of Phentermine, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 9

31.     On or about September 11, 2003, in the Northern District of Iowa and elsewhere, defendant DAVID M. BARON, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to S.K., a resident of the Northern District of Iowa, thirty (30) tablets of Phentermine, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 10

32.     On or about September 15, 2003, in the Northern District of Iowa and elsewhere, defendant DAVID M. BARON, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to M.A., a resident of the Northern District of Iowa, thirty (30) tablets of Tenuate 75, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 11

33.     On or about September 17, 2003, in the Northern District of Iowa and elsewhere, defendant DAVID M. BARON, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to L.D., a resident of the Northern District of Iowa, thirty (30) tablets of Phentermine, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 12

34.     On or about October 7, 2003, in the Northern District of Iowa and elsewhere, defendant FELIX RODRIGUEZ-SCHMIDT, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to S.K., a resident of the Northern District of Iowa, thirty (30) tablets of Diazepam, a

16

Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice. This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 13

35.    On or about October 29, 2003, in the Northern District of Iowa and elsewhere, defendant DAVID M. BARON, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to S.S., a resident of the Northern District of Iowa, ninety (90) tablets of Didrex 50 mg, a Schedule III controlled substance, without a legitimate medical purpose and outside the course of usual professional practice. This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D).

## COUNT 14

36.    On or about November 18, 2003, in the Northern District of Iowa and elsewhere, defendant ALEXIS ROMAN-TORRES, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to J.L., a resident of the Northern District of Iowa, two-hundred and seventy (270) tablets of Phendimetrazine, a Schedule III controlled substance, without a legitimate medical purpose and outside the course of usual professional practice. This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D).

17

### COUNT 15

37.     On or about November 18, 2003, in the Northern District of Iowa and elsewhere, defendant IRIC SPEARS, did knowingly and intentionally cause to be distributed to P.M., a resident of the Northern District of Iowa, ninety (90) tablets of Phentermine, a Schedule IV controlled substance.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

### COUNT 16

38.     On or about December 5, 2003, in the Northern District of Iowa and elsewhere, defendant ALEXIS ROMAN-TORRES, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to P.M., a resident of the Northern District of Iowa, ninety (90) tablets of Phentermine, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

### COUNT 17

39.     On or about December 23, 2003, in the Northern District of Iowa and elsewhere, defendant ALEXIS ROMAN-TORRES, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to J.M., a resident of the Northern District of Iowa, ninety (90) tablets of Didrex 50 mg, a Schedule III controlled substance, without a legitimate medical purpose and outside the

18

course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D).

## COUNT 18

40.    On or about February 23, 2004, in the Northern District of Iowa and elsewhere, defendant ALEXIS ROMAN-TORRES, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to J.M., a resident of the Northern District of Iowa, ninety (90) tablets of Phentermine, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 19

41.    On or about February 24, 2004, in the Northern District of Iowa and elsewhere, defendant ALEXIS ROMAN-TORRES, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to D.K., a resident of the Northern District of Iowa, sixty (60) tablets of Phentermine, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice.  This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 20

42.    On or about March 18, 2004, in the Northern District of Iowa and elsewhere, defendant ALEXIS ROMAN-TORRES, M.D., a registrant authorized to

dispense controlled substances, did knowingly and intentionally cause to be dispensed to J.H., a resident of the Northern District of Iowa, thirty (30) tablets of Diazepam, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice. This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 21

43.     On or about March 18, 2004, in the Northern District of Iowa and elsewhere, defendant KIMBERLY TREVER, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to V.M., a resident of the Northern District of Iowa, sixty (60) tablets of Alprazolam, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice. This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

## COUNT 22

44.     On or about May 11, 2004, in the Northern District of Iowa and elsewhere, defendant ALEXIS ROMAN-TORRES, M.D., a registrant authorized to dispense controlled substances, did knowingly and intentionally cause to be dispensed to S.K., a resident of the Northern District of Iowa, thirty (30) tablets of Diazepam, a Schedule IV controlled substance, without a legitimate medical purpose and outside the course of usual professional practice. This in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D)(2).

20

## FORFEITURE ALLEGATION

45.     Upon conviction of one or more of the controlled substance offenses

alleged in Counts 1-22 of this Indictment, defendants MEDICAL WEB SERVICES;

STEPHEN L. ANCIER, M.D.; DAVID M. BARON, M.D.; FELIX RODRIGUEZ-SCHMIDT,

M.D.; ALEXIS ROMAN-TORRES, M.D.; KIMBERLY TREVER, M.D.; and IRIC

SPEARS, shall forfeit to the United States pursuant to 21 U.S.C. § 853, any property

constituting, or derived from, proceeds obtained, directly or indirectly, as a result of said

violations and any property used, or intended to be used, in any manner or part, to

commit, or to facilitate the commission of the said violations, including but not limited to

the following:

A)     MONEY JUDGMENT - DEFENDANT MEDICAL WEB SERVICES:
A sum of money equal to approximately $41,446,434.81 in United States
currency, representing the amount of proceeds obtained as a result of the
drug offense described in Count 1.

B)     MONEY JUDGMENT - DEFENDANT STEPHEN L. ANCIER:
A sum of money equal to approximately $465,955 in United States
currency, representing the amount of proceeds obtained as a result of the
drug offense described in Counts 1, and 3-6 above.

C)     MONEY JUDGMENT - DEFENDANT DAVID M. BARON:
A sum of money equal to approximately $65,992 in United States
currency, representing the amount of proceeds obtained as a result of the
drug offenses outlined in Counts 1, 2, 7-11, and 13 above.

D)     MONEY JUDGMENT - DEFENDANT FELIX RODRIGUEZ-SCHMIDT:
A sum of money equal to approximately $14,400 in United States
currency, representing the amount of proceeds obtained as a result of the
drug offenses outlined in Counts 1 and 12 above.

E)     MONEY JUDGMENT - DEFENDANT ALEXIS ROMAN-TORRES:
A sum of money equal to approximately $134,130 in United States
currency, representing the amount of proceeds obtained as a result of the
offenses outlined in Counts 1, 14, 16-20, and 22 above.

F)   MONEY JUDGMENT - DEFENDANT KIMBERLY TREVER:
     A sum of money equal to approximately $42,247 in United States
     currency, representing the amount of proceeds obtained as a result of the
     drug offense outlined in Counts 1 and 21 above.

G)   MONEY JUDGMENT - DEFENDANT IRIC SPEARS:
     A sum of money equal to approximately $37,698.47 in United States
     currency, representing the amount of proceeds obtained as a result of the
     drug offense outlined in Counts 1 and 15 above.

All in accordance with Title 18, United States Code, Section 982(a)(1) and Rule

32.2(a), Federal Rules of Criminal Procedure.


A TRUE BILL

MATT M. DUMMERMUTH                    / s /
United States Attorney               _____
                                     Foreman

By: _Stephanie M. Rose_              _8\6\08_____
                                     Date
STEPHANIE M. ROSE
Assistant United States Attorney